REID, Judge.
This is an expropriation suit by Florida Gas Transmission against William T. Woodside and others. The plaintiff-appellant is a natural gas company certified within the meaning of the Natural Gas Act and is operating under certificates of public convenience and necessity from the Federal Power Commission. Plaintiff has a 30 foot right-of-way on which is located its 24 inch transmission line across the defendants’ property, which right-of-way was acquired in 1958. It is now seeking a construction right-of-way 60 feet in width directly south of the existing right-of-way which is adjacent and parallel to it, and at the conclusion of the construction the south 30 feet of the 60 foot construction right-of-way will revert to the defendants and plaintiff would retain a permanent easement 30 feet in width upon which to maintain and operate the proposed pipeline.
Although various issues were raised in the answer filed by defendants, by the time of the trial the sole issue was the question of just compensation to be paid the defendants.
The defendants’ property is a 700 acre tract, being all of. Sections 51 and 52, Town *717 ship S South, Range 2 West, in the Parish of East Baton Rouge, below or West of the Mobile Ridge. This is a large tract fronting on Steamboat (Profits Island) Chute of the Mississippi River and on its upper end opens onto the main channel of the Mississippi River.
The Mobile Ridge separates the property from the bluff land and a great deal of the property consists of lakes and swamps and is subject to overflow when the Mississippi River reaches a stage above the 35 foot level.
The tract consists of 700 acres, of which 3.34 acres would be taken as a permanent servitude and timber on 8.6 acres for the temporary servitude would be destroyed during the construction period.
After trial on the merits, the District Judge awarded the plaintiff the sum of $1,002.00 for the 3.34 acres for the servitude, basing this figure on the price of $300.00 an acre, and awarded $998.11 for the destruction of timber on the 8.6 acres, and $10,500.00 severance damages, based on a 5% diminution in the property, making a total award of $12,500.11.
The main issue on this appeal concerns the severance damages, it being admitted that the value of the timber destroyed is $998.11 and there being no real issue concerning the $300.00 an acre for the servitude. This Court, will accept those figures and feels no need to discuss that phase of the case in this opinion.
The real point at issue between the position of the plaintiff and that of the defendants arises out of the classification of the property involved in the litigation and the resulting award in severance damages based on that classification. It is upon this issue that this appeal is lodged. The plaintiff contends that the highest and best use of the property in its present condition is for timber growing purposes and that this is the purpose for which it is now being used and will be used in the forseeable future. The defendants contend that the property has a present day value as industrial site property, and in this position were supported by the District Judge.
The bulk of the testimony in this case is from four expert witnesses, two of whom, Mr. Chester A. Driggers and Mr. Julius A. Bahlinger, III, were called by the plaintiff, and the other two, Mr. George Comeaux, Jr. and Mr. William Warren Munson, were called on behalf of the defendants. In his reasons for judgment the Trial Judge commented on the witnesses as follows:
“Four expert witnesses were heard in this trial, two presented by the plaintiff and two by the defendants. Those called by plaintiff were Mr. Chester A. Driggers and Mr. Julius A. Bahlinger III, and those called by the defendant landowners were Mr. George Comeaux, Jr. and Mr. William Warren Munson. This court has never had the privilege of hearing Mr. Comeaux prior to this trial. The court has heard testimony from both Mr. Driggers and Mr. Bahlinger in other similar suits, and has a very high regard for these three gentlemen and has no intention of reflecting on their qualifications as appraisers; however, each of the three testified very frankly that he had had little, if any, experience in dealing with industrial properties. It is for this reason that the court feels it must be guided in its decision here by the testimony of Mr. Munson, who has had wide experience in the field of industrial appraisals and industrial sales, and been heard on numerous occasions in this court on those questions.
“ * * * I repeat that my decision here is based entirely on the testimony of Mr. Munson, the court believing that his testimony is the only testimony that bears directly, and bears with authority, on the questions before the court.
“His testimony is that this property has a present market value of $300 per acre. In that connection the court calls attention to the fact that Mr. Driggers placed *718 a «value of $200 per acre on this property and that Mr. Bahlinger placed a value of $300 per acre, as did Mr. Comeaux. Those three witnesses, however, based the value of the servitude taken on a percentage basis of their evaluation per acre of the property. Mr. Driggers testified that the permanent servitude in his opinion represented 80 per cent of the value placed by him on the property, that is, $160 per acre, and that the temporary servitude represented 50 per cent of the value per acre. He found that the fair market value of the property taken would be $1395. Mr. Bahlinger used for the permanent servitude 60 per cent, and based the value of the permanent servitude in round figures at $600. ' I might state, if I haven’t already so stated, that the permanent servitude covers an area of 3.34 acres, and the temporary servitude 8.6 acres. Mr. Bahlinger placed 15 per cent as the value of the temporary servitude rounded out, I believe, to exactly $400, making a total of $1000. Mr. Comeaux used 75 per cent for the permanent servitude and 50 per cent for the temporary servitude, making a total of $2041.50, and he estimated the severance damages to the property at $12,000. I will not discuss the manner in which he arrived at that figure, but it is stated mathematically as part of his testimony. Mr. Munson placed a value- of $300 per acre on this property. - It is his opinion that the permanent servitude is equivalent to the taking of fee title to the property, and that figure is $1002. He further was of the opinion that nothing was due for the temporary servitude, and came up with a total, of $1002 as the value of the property taken. That is somewhat less than Mr. Driggers found, it is two dollars more than Mr. Bahlinger found, and slightly less than half of what Mr. Comeaux found.
“Then Mr. Munson testified that in his expert opinion the laying of this additional pipeline across the property would depreciate the present market value of the property a minimum of five per cent, and the court is going to follow his findings on this point. If I mistake not, he is saying that the severance damage to this property is $10,500. He gave his reasons and I am not going to elaborate on his reasons; they are in the record. I repeat that that is his expert opinion which the court feels that it should follow.
“It is not disputed that the taking of these servitudes will take from this property merchantable timber of the value of $998.11.
“For these reasons there is judgment in favor of these defendants for the amounts stated, that is, $1002, $10,500 and $998.11, or a total of $12,500.11.
“The expert witness fee of Mr. George Comeaux, Jr. is fixed at $200, and the expert witness fee of Mr. William Warren Munson is fixed at $500, and these fees are taxed as costs.”
The record clearly shows that the property in question is primarily swamp land and is laced with various lakes, and a large percentage of it lies under water. There is no question but what it is presently being used primarily for the growing of timber. However, there are certain other factors which this Court feels are relevant to the issue. The property in question is in an area which is rapidly becoming greatly industrialized and is surrounded, although not immediately, by industrial sites. The property is located above the Devil’s Swamp industrial complex in the Parish of East Baton Rouge which contains the plants of Union Tank Car, Schuylkill, Kaiser Aluminum, and North Baton Rouge Development Company. Also, in July of 1965 the Regal Paper Company acquired a 945 acre tract to the north of the subject property where a large paper manufacturing plant is being located, and the North Baton Rouge Development Company has bought property east of the subject property. While it is true that most of this property was on high land and not swamp land, the property in. *719 question nevertheless is located in this area of industrial growth to such a degree that it can be assumed that the District Judge would take judicial notice of this fact. In addition to this fact, the record shows that in 1958 the defendants were paid the sum. of $832.97 for the servitude granted to plaintiff’s predecessor and were paid the sum of $9,167.03 as damages for the laying of the original line.
Mr. Munson, on whose testimony the Judge relied and who was, as borne out by the record, the best qualified of the four witnesses, testified that the highest and best use of the property is that it offers a continuity from the highlands to- the water and to the river and to the river chute and that this continuity of the highland property to the river will add tremendous value to the property to the east of it. In other words, the subject property would have an industrial use in combination with surrounding property on high lands. He further testified that its accessibility to water for possible barge transportation and for use by industries make it valuable as industrial property. Availability to water is one of the prime considerations for industrial property in the Baton Rouge area. Mr. Munson further stated that the property in question would be valuable to industries as a place to run refuse. He said in fact the paper company had tried to purchase property by Faulkner Lake, which is north of the subject property, for the purpose of running its refuse in order to purify it before running it into the river. He further testified as follows:
“Q. In summary, then, what is the highest and best use of the subject property?
A. The highest and best use is in conjunction with other properties in the highlands to reach the river.
Q. For what purpose?
A. For industrial purposes. It will be sold at that, for that reason.”
On this point Mr. Munson was unshakable. In his opinion any property suffers damages because of a second pipeline cutting through it and limiting its potential use. In this connection he said:
“Q. In your opinion will this subject property suffer any severance damages as a result of this second pipeline being across it.
A. For a number of reasons it will suffer damages.
Q. What amount of damages?
A. The placing of damages requires some explanation, and I’d like to give that before I give the estimates.
Q. All right.
A. There is no way that I have ever heard nor am I able to give, to say exactly how much a property is damaged by a pipeline. The mere fact that that pipeline, and a double pipeline, or even a single pipeline, or the fear of the third pipeline is in existence on a map, the mere fact that a purchaser will see a map such as presented to this Court before reduces the ability for the owner to bargain. It takes away one of his bargaining points, it leaves him open to those folks going to other lands that do not have a pipeline, and the company is going to select the land that doesn’t have the pipeline first, if it is of equal value. So the mere fact that that’s on a plat that you show, places the owner in a very bad position, and I would say that five per cent of the loss of property would be the minimum, and I’m placing the minimum value of five per cent on the loss of value, which in my opinion the whole value of this property is $310,000, I mean $210,000, and five per cent of that—
Q. For what, Mr. Munson?
A. That’s for the second pipeline.”
*720 Mr. Munson said that to the buying public and to the buying industrialist a second pipeline brings on fear of a third pipeline and that the prices of properties and the values of properties are subject to psychological factors and the existence of pipelines contribute to this “any anyone that says that property is not affected by the second pipeline hasn’t ever sold industrial property.”
Mr. Comeaux, the defendants’ other witness, testified in a similar vein.
Mr. Driggers and Mr. Bahlinger, plaintiff’s witnesses, both testified there were no severance damages. Mr. Driggers said he had never negotiated a sale for industrial property in this area nor had he been approached and that his testimony was based entirely on other sales. Mr. Bahlinger testified that he had only once had experience in buying or selling industrial property in East Baton Rouge Parish and the property was not located along the Mississippi River. He found no severance damages because insofar as he could see the property could be utilized after the taking in the same manner as it presently is being utilized and would be utilized in the foreseeable future. He did, however, testify that the property’s highest and best use was in conjunction with future potential industrial use as river frontage and batture land. He further testified that the land is primarily access land and industrial possibly as disposal of industrial waste and he could not see how the pipeline would affect the use of this property in that capacity.
In this Court’s opinion the main distinction between plaintiff’s and defendants’ witnesses is that the defendants’ witnesses maintain the present best use is for industrial purposes while plaintiff’s witnesses, especially Mr. Bahlinger, contend that it might have industrial use but that this is in the future and not the present.
In support of its position plaintiff cites many authorities which although sound are not in the opinion of this Court appropriate to the issue herein.
We feel that the following quotation from the decision of the Court of Appeal of Louisiana, Third Circuit, in the case of Veillon v. Columbia Gulf Transmission Company, 192 So.2d 646, is appropriate to the case at issue. In that case Judge Tate, as organ of the Court, in discussing this point said:
“Columbia Gas, the present appellant, contends such additional severance damages are not allowable because the present is a second high-pressure line. It suggests that any loss in market value caused by fear of explosion, etc., had already been caused by the first line. It points out that severance damages for a second pipeline were not allowed in Texas Gas Transmission Corp. v. Fuselier, La. App. 3 Cir., 133 So.2d 828. (Emphasis by author)
“Nevertheless, where the evidence shows that the additional pipeline causes additional loss' in the market value of the remainder of the property left after the taking, then the landowner is of course entitled to an award for this additional diminution in market value in accord with the constitutional requirement that landowners be compensated for any damage caused by a taking for a public purpose. United Gas Pipe Line Company v. Nezat, La.App. 3 Cir., 160 So.2d 367, certiorari denied. For instance, in Fuselier — relied upon by the present appellant — , we on original hearing remanded for the limiting purpose of establishing severance damages caused by the laying of the second pipeline, 133 So.2d 831, and on rehearing we disallowed them only because the matter had been at issue at the trial and a majority of this court regarded the landowner’s skimpy evidence as insufficient proof of such damages, 133 So. 2d 836.”
The Trial Judge, who heard all of the witnesses and who was well acquainted with the qualifications of both of the witnesses for the plaintiff and one of the witnesses for the defendants, chose to accept *721 the testimony of the witness who is admittedly the only one with wide knowledge and experience concerning the use of the property for industrial purposes in an area which is admittedly undergoing rapid development industrially.
To state that the addition of a second pipeline across the same property would not diminish the value of the property is unsound and certainly the Trial Judge was impressed with the testimony of Mr. Munson to the effect that two pipelines have a psychological effect upon prospective purchasers and certainly the fact that there are two lines across a piece of property can cause a prospective purchaser to fear a third and possibly more pipelines.
An examination of the voluminous jurisdiction concerning severance damages in expropriation suits clearly shows that in such matters each case is decided upon the facts peculiar to that case and it is difficult to apply the rule of one case to a different factual situation found in another case. Matters such as this depend in large part upon the Trial Judge’s opinion as to the weight to be given to the testimony of each expert witness regarding property located in an area about which the Trial Judge has general knowledge, and great care must be given by the appellate Court not to substitute its judgment for that of the Trial Judge unless the opinion of the Trial Judge is manifestly erroneous. Certainly when all of the facts shown in this record and mentioned above, such as the location of the land and the great industrial growth of the area, are taken into consideration along with the testimony of Mr. Munson, who was clearly the most qualified witness to testify on the trial, it cannot be said that the decision of the Trial Judge in this case was erroneous.
Just in passing, without commenting upon all of the authorities cited by plaintiff, this Court feels that the case of Michigan Wisconsin Pipe Line Company v. Peterson, La.App., 192 So.2d 900, cited by the plaintiff, is not appropriate herein. All the Court is saying in that case in connection with the issue herein is that they found nothing in the record which would indicate an entitlement to severance damages. There is nothing in the factual situation in that case which fits the case at issue here.
For the above and foregoing reasons the judgment of the District Court is affirmed.
Affirmed.